## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | |
|---|---|
| RAHUL GORAWARA,<br>        *Plaintiff*,<br><br>        v.<br><br>JOHN CAPRIO and CAROLYN CAPRIO,<br>        *Defendants*. | No. 3:19cv756 (MPS) |

### RULING ON MOTION TO DISMISS

Plaintiff Rahul Gorawara, who is proceeding *pro se*, filed this action against defendants John and Carolyn Caprio, his former landlords, alleging violation of federal statutes, the United States Constitution, and Connecticut state law.  The Caprios move to dismiss counts 1, 8, and 10-15 under Fed. R. Civ. P. 12(b)(6).  ECF No. 39.  For the reasons that follow, the motion is GRANTED IN PART and DENIED IN PART.

## I.    FACTUAL ALLEGATIONS

The following facts are drawn from Gorawara's second amended complaint (ECF No. 34) and are accepted as true for the purpose of this ruling.

Gorawara was a tenant in the second floor apartment at 152-154 Mansfield Street in New Haven.  ECF No. 34 ¶ 5.  Gorawara "identifies as a member of the Asian minority."  *Id.* ¶ 17.  The Caprios, who are Caucasian, own the building and were Gorawara's landlords.  *Id.* ¶¶ 6, 17.  "Carolyn Caprio delegated property management responsibilities for 152-154 Mansfield to John Caprio."  *Id.* ¶ 9.  Before Gorawara moved in, Carolyn Caprio "explained that John Caprio would serve as the primary point of contact during the Plaintiff's tenancy. In her presence, John Caprio explained that he had full authority to act with regard to the lease and its renewal, collection of rent, repair of the property, and all other aspects of tenant relations."  *Id.*

"After the Plaintiff moved into the apartment, John Caprio and Carolyn Caprio, invoking their authority as landlords, entered the second floor apartment he rented." *Id*. ¶ 13. They saw that Gorawara had "prominently displayed" in his apartment an ornament of "great ethnic significance – an Om symbol." *Id*. ¶ 14. "Om is a Sanskrit symbol that is associated with the divine in Buddhism, Hinduism, and other religions with Asian ethnic roots." *Id.* ¶ 16.

The Caprios "did not treat the Plaintiff the same as their Caucasian tenants. This differential treatment extended to their handling of maintenance and repair issues." *Id.* ¶ 19. On October 16, 2016, Gorawara "alerted John Caprio that sewage was backing up out of the bathroom sink." *Id.* ¶ 20. "The Caprios reacted to this potentially serious health issue by rescinding their offer to renew the Plaintiff's lease and threatening to evict the Plaintiff. John Caprio explained that since the Plaintiff had a month-to-month lease, he had full authority to 'quit' the Plaintiff whenever he desired and 'within 30 days you're going to leave.'" *Id.* ¶ 21. "Upon information and belief, the Caprios entered into annual leases with their Caucasian tenants, thereby affording them additional protection against such retaliation. As John Caprio explained to the Plaintiff, 'I really don't want to sign a lease with you. This way here, ... if I'm uncomfortable, I have the right to go to court and have them quit it and in 30 days you move out.'" *Id.* ¶ 22. "Over the course of the ensuing week, the Caprios threatened and bullied the Plaintiff to move out on his own. These threats centered on the safety of the Plaintiff's belongings. John Caprio implied that if the Plaintiff moved out immediately, his belongings would stay intact and no harm would come to him." *Id.* ¶ 23. Gorawara "learned that John Caprio - who is an agent of Carolyn Caprio - had encouraged other tenants to take personal property that belonged to the Plaintiff from a designated storage area." *Id.* ¶ 24. "Threats regarding the safety of the Plaintiff's belongings were particularly credible because John Caprio had, in the past, prior to October 2016, entered the Plaintiff's

apartment without notice or consent and removed items when the Plaintiff was not home." *Id.* ¶ 25.  "The Caprios threatened to begin eviction proceedings against the Plaintiff in October 2016." *Id.* ¶ 26.  On October 17, 2016, "John Caprio stated, 'I called the Court today, because ... I was going to have to send you an eviction notice.'" *Id.*  "The Caprios, however, did not begin eviction proceedings in October, presumably because they had already deposited his October rent check by that point. Indeed, the Plaintiff had never missed a rent payment. Instead, the Caprios waited until the first available opportunity - November." *Id.* ¶ 27.

**November Rent Check**

"The Caprios accepted payments from their tenants, including the Plaintiff, via mail." *Id.* ¶ 28.  Gorawara's rent for November 2016 was mailed on November 2, 2016 to the usual address. *Id.* ¶ 29.  "The Plaintiff's financial institution states that the Plaintiff's November 2016 rent check arrived on or before November 7, 2016." *Id.* ¶ 30.  "The Caprios willfully did not deposit the Plaintiff's November 2016 rent check." *Id.* ¶ 31.  The Caprios have a practice of notifying their tenants if they do not receive their rent check within a few days after it is due.  *Id.* ¶ 32.  "The Caprios, however, declined to follow this practice with regard to the Plaintiff's November 2016 rent check. Upon information and belief, they have never declined to do so for their Caucasian tenants." *Id.* ¶ 33.  Although Gorawara "tried to contact them to ask why they had not deposited the rent check," the Caprios did not respond.  *Id.* ¶ 34.  The Caprios hired a state marshal to serve a notice to quit on Gorawara.  *Id.* ¶ 36.  The state marshal served the Caprios' notice to quit on November 14, 2016.  *Id.* ¶ 37.  The Plaintiff "had until November 30, 2016 to get the Caprios to deposit his rent check."  *Id.* ¶ 38.  "This explains why John Caprio was so insistent on not communicating with the Plaintiff during the month of November. If the Plaintiff could find John Caprio or Carolyn Caprio in person and hand him or her a reissued rent check, they would be

3

forced to accept it and therefore could not evict the Plaintiff for non-payment of rent." *Id*. "Upon information and belief, the Caprios have never refused to accept a rent check from their Caucasian tenants." *Id*. ¶ 39. "As soon as the Caprios could - the day after the November 30th deadline to cure - they filed a summary process eviction action." *Id*. ¶ 40. Immediately after John Caprio filed the summary process eviction action, "the Caprios began a campaign to harass and intimidate the Plaintiff to leave." *Id*. ¶ 41.

**Police Officer Involvement**

"The Caprios tried over and over again to enlist police officers in their campaign to intimidate the Plaintiff." *Id*. ¶ 42. "Even if the Caprios could not convince a police officer to arrest the Plaintiff, they believed that they could pressure an officer to speak to the Plaintiff in a threatening manner - in a manner that demands he move out immediately and never return to the neighborhood." *Id*. ¶ 43. "Upon information and belief, in each incident when the Caprios attempted to enlist the police, they took steps to communicate the Plaintiff's skin color." *Id*. ¶ 44. "Upon information and belief, the Caprios never tried to enlist police officers in a campaign to intimidate a Caucasian tenant into moving out and never returning to the neighborhood." *Id*. ¶ 46.

On December 3, 2016. John Caprio was parked on the street. *Id*. ¶ 47. When he saw the Plaintiff, John Caprio "exited his car and accosted the Plaintiff as the Plaintiff made his way down the sidewalk." *Id*. John Caprio "engage[d] in a barrage of verbal abuse and physically threatening behavior. He raised his voice considerably and lunged towards the Plaintiff, violating his personal space. Fearing for his safety, the Plaintiff left the scene." *Id*. ¶ 48. "The Caprios agreed that John Caprio would call the police and falsely report that the Plaintiff had assaulted him and then would pressure the officer assigned to investigate to either arrest the Plaintiff or to intimidate the Plaintiff into moving out of his apartment and leaving the neighborhood permanently." *Id*. ¶ 50. "John

Caprio told the police officer that he had a witness who would corroborate this account of what happened." *Id.* ¶ 51.  "The witness, however, told the police the opposite." *Id.* ¶ 52. "The witness told the officer that 'Caprio was the aggressor of the incident. That he saw Caprio walked [sic] up to the other man [the Plaintiff] and yell at him.'" *Id.* ¶ 53.

**The Crucifix**

The Caprios "employed racially hateful intimidation techniques" – "techniques that targeted the Plaintiff's Asian identity, an identity that the Plaintiff had prominently displayed in his apartment with, for example, the Om ornament." *Id.* ¶ 55.  "For instance, shortly before a hearing in the eviction action, John Caprio, at the insistence of Carolyn Caprio, mounted a big and heavy crucifix to the wall at the entrance of the Plaintiff's apartment." *Id.* ¶ 56.  John Caprio and another man "used power tools to mount the crucifix and seal it to the wall, making it very difficult to remove." *Id.* ¶ 58.  "The floor was covered with debris from the holes they drilled in the wall." *Id.* ¶ 59.  "Upon information and belief, when the Caprios or their agents install a fixture that is designed to benefit a tenant or that a tenant had requested, they clean up debris that they leave." *Id.*  "The prominent placement of the crucifix at the entrance to the Plaintiff's apartment isolated him - making him ashamed to invite guests to his apartment. It signaled that racial minorities, such as the Plaintiff, were not welcome." *Id.* ¶ 61. "The Caprios mounted the crucifix without first obtaining the Plaintiff's consent and without giving him prior notice. Upon information and belief, the Caprios do not install fixtures at the entrance to their Caucasian tenants' apartments without first doing so." *Id.* ¶ 62.  The Caprios "refused to take down the crucifix when the Plaintiff objected to its location at the entrance to his apartment." *Id.* ¶ 63.  They "did not install crucifixes at the entrance to their Caucasian tenants' apartments - thereby singling out the Plaintiff for discriminatory treatment." *Id.* ¶ 64.  "The shaming function of the Caprios' actions impinged on

the Plaintiff's First Amendment freedom of association. It marked him as different and discouraged visitors to his apartment - particularly those that identify as minorities." *Id.* ¶ 65.  Gorawara "did not attend the state court hearing in support of his motion [in the eviction action] because he worried that mounting the crucifix shortly before a court hearing was a warning that the Caprios retain the keys to his apartment and can send an agent to hurt him if he continue[d] to seek legal redress." *Id.* ¶ 145.  "As a direct result, the court summarily denied the Plaintiff's motion without considering its merits. The court order simply stated, 'Defendant failed to appear.'" *Id.* ¶ 146.

**The Eviction and the Police**

"The Caprios hired a state marshal to conduct the eviction and worked jointly with him to coordinate all aspects of the eviction." *Id.* ¶ 67. "The state marshal scheduled the eviction for May 17, 2017 at 9:00 am." *Id.* ¶ 68.  "The court ordered that the marshal 'must use reasonable efforts to locate and notify the [Plaintiff] ... of the date and time the eviction is to take place.'" *Id.* ¶ 69. "Neither the Caprios nor the state marshal they hired gave the Plaintiff notice that the eviction would occur on May 17, 2017. In fact, the state marshal gave the Plaintiff the wrong date - and did not correct it despite having the Plaintiff's phone number." *Id.* ¶ 70.  "The Caprios acted with discriminatory animus and sought to maximize the injuries that the Plaintiff's eviction would inflict. Keeping the Plaintiff in the dark about the date of the eviction aided their efforts." *Id.* ¶ 71. "[B]y failing to give the Plaintiff notice of the date on which the eviction would occur, they caught the Plaintiff by surprise. If the Plaintiff was provided notice of the correct date, as contemplated by the court order, then he could have packed his belongings so that they would not be damaged." *Id.* ¶ 101.

"In conjunction with the eviction, the Caprios schemed to defame the Plaintiff in a manner they hoped would lead to police action - action that would ensure the Plaintiff would never return

to the neighborhood, not as a renter of another landlord, not as a homeowner, not as a visitor or guest, and not as a passerby." *Id.* ¶ 72. "As soon as the eviction began, the Caprios called the police and falsely accused the Plaintiff of hiring movers to take the Caprios' belongings." *Id.* ¶ 73. "The police officers dispatched to location came to find a number of men moving belongings out of the apartment. The Caprios' false statements made it seem as if the men were acting at the Plaintiff's behest." *Id.* ¶ 74. The men "were agents of the state marshal that the Caprios hired and were acting at the Caprios' behest. Indeed, the Caprios oversaw their efforts and directed them on what to move and what not to move during the course of the eviction." *Id.* ¶ 75. "Carolyn Caprio sought to compound the Plaintiff's distress at that moment by going up to him and screaming language of a divisive and hateful nature. In the course of her screaming, she defended the discriminatory actions taken by her agent John Caprio over the prior months . . . thereby demonstrating that she consented to and/or ratified his conduct." *Id.* ¶ 76. "Carolyn Caprio's verbal abuse was completely unprovoked." *Id.* ¶ 77. Her screaming "drew the attention of neighbors and passersby. She went right up to the Plaintiff and loudly repeated the word 'shame' and phrases that include the word 'shame.'" *Id.* ¶ 78. She "repeated accusations that she and/or her agents knew were false - for example, that the Plaintiff was in the process of stealing an abundance of the Caprios' belongings from the second floor apartment and that the Plaintiff changed the locks leading to two apartments." *Id.* ¶ 79. "Carolyn Caprio's repeated use of the word 'shame' demonstrates that the crucifix John Caprio mounted at her insistence was intended to shame the Plaintiff, both privately and in front of his guests. Indeed, the language she used on May 17 took on a personal and non-secular nature." *Id.* ¶ 80. Her "actions impeded the Plaintiff's ability to communicate with the police that the Caprios summoned" but "[a]fter the Plaintiff spent much time and effort clarifying the situation, the police ultimately declined to arrest the Plaintiff."

*Id.* ¶¶ 82-83.  An officer remained at the location and spoke with the Caprios "about possible steps that they could take instead." *Id.* ¶ 84.  The police officer "eventually left" but "[a]t the conclusion of the eviction, the Caprios called him and asked him to return." *Id.* ¶ 85.  The police officer "spoke with John Caprio at length and reached an agreement with the Caprios on how to ensure that the Plaintiff never returns to the neighborhood. Upon information and belief, the officer agreed to intimidate the Plaintiff to never return to Mansfield Street again and in exchange the Caprios agreed to stop calling the officer." *Id.* ¶ 86.  The police officer then left to go find the Plaintiff, who was in a vehicle parked on Mansfield Street. *Id.* ¶ 87.  The officer asked the Plaintiff to roll down his window. *Id.* ¶ 88.  The Plaintiff complied and showed him a valid parking permit, which permitted him to park on Mansfield Street. *Id.*  "The officer demanded that the Plaintiff drive away immediately and never return to Mansfield Street." *Id.* ¶ 89.  "The Plaintiff explained that he was legally allowed to park here and only needed a few more minutes to figure out directions" but the officer told Plaintiff that "he needed to leave right now." *Id.* ¶ 90.  The police officer also said that Plaintiff "would be arrested for trespassing" if the officer ever found out that the Plaintiff returned to Mansfield Street. *Id.* ¶ 91.  "When the officer reported the incident, he changed the Plaintiff's racial classification in police records to read white. This material misstatement must be deliberate as no reasonable person who meets the Plaintiff could conclude that he is Caucasian." *Id.* ¶ 96. "Upon information and belief, the officer did not threaten Caucasian individuals with arrest for trespass because they were parked in their vehicle on a public street with a valid parking permit; the officer did not threaten Caucasian individuals with arrest for trespass if they walk down the sidewalk of Mansfield Street; the officer did not demand that Caucasian individuals never return to a public street in any capacity at any point in the future after they had been evicted by a landlord;

the officer did not reach an agreement with a landlord to threaten a former Caucasian tenant with arrest without probable cause so that he or she never returns to the neighborhood." *Id.* ¶ 98.

During the eviction process, "the Caprios and/or the individuals they hired" took Plaintiff's OM ornament. *Id.* ¶ 99. "[O]ther personal items" were damaged "by the Caprios and/or individuals they hired." *Id.* ¶ 100. "For example, the Plaintiff's flat screen TV was shattered." *Id.* The Caprios "instructed the marshal's agents who were conducting the eviction to remove the Plaintiff's belongings as fast as possible, without regard for the safety of the items that they were removing. John Caprio, in fact, chided the marshal if his agents took the care to pack an item before removing it." *Id.* ¶ 102.

### Conn. Gen. Stat. § 52-215

"The Caprios enlisted the compulsive powers of the State to seize possession of the second floor apartment at 154 Mansfield Street by hiring a state marshal to execute on a judgment issued by a state court clerk" under Conn. Gen. Stat. § 52-215, which does not provide for a civil jury trial in summary process actions. *Id.* ¶ 155. Citing the statute, "the clerk at the New Haven Housing Session refused the Plaintiff's request to file a jury demand in the summary process action." *Id.* ¶ 161. "The Plaintiff objected to the clerk's denial of his jury demand. The Caprios, however, did not consent to transfer their action out of summary process and into the New Haven Superior Court where it could be claimed for a jury." *Id.* ¶ 162. Conn. Gen. Stat. § 52-215 provides that "any claim for a jury trial is permanently waived if not filed to the docket 'within ten days after [the last] issue of fact is joined.'" *Id.* ¶ 163. "The Plaintiff refused to waive his constitutional right to a jury trial in the summary process action" and "therefore - unless the clerk allow[ed] him to file a jury demand - declined to file an answer that would trigger the ten day deadline for waiver." *Id.* ¶ 165. The clerk entered an order stating, "You must file an answer with the court, to the summary

process (eviction) complaint against you on or before April 17, 2017. Your failure to do so will result in judgment automatically entering against you without the need for a hearing." *Id.* ¶ 166. "Because the clerk's position on the jury demand did not change, the Plaintiff did not file his answer by April 17, 2017.  In response, the court entered default judgment against the Plaintiff on April 18, 2017 'for failure to file an answer.'"  *Id.* ¶ 167.  "Based on the default judgment for failure to file an answer, the Caprios, through counsel, requested that the clerk sign a summary process execution for possession form.  The clerk ultimately did so."  *Id.* ¶ 168.  The Caprios then hired a state marshal to evict the Plaintiff based on the signed summary process execution for possession form issued by the clerk.  *Id.* ¶ 169.

**Conn. Gen. Stat. § 47a-35a(a)**

"Under Conn. Gen. Stat. § 47a-35a(a), residential tenants can only appeal if they post a bond within 'the period allowed for taking such appeal' - that is, 5 days from when judgment is entered as stated in § 47a-35."  *Id.* ¶ 175.  "Commercial tenants however are not bound by the strict 5 day deadline of § 47a-35a(a)," because they are not automatically required to post an appeal bond.  *Id.*  ¶  176.   "Connecticut  Practice  Book  §  60-7  requires  parties  to  file  their  appeals electronically using the court website. It does not allow appeals to be filed in person or via mail or fax."  *Id.*  ¶ 180.  The Plaintiff electronically filed an appeal in the summary process action within the 5 day window.  *Id.* ¶ 181.  "The electronic system, however, malfunctioned and did not issue him a docket number for his appeal. Instead, it directed him to contact support for additional information  and  assigned  him  [an]  incident  ID  number."   *Id.*  ¶ 183. "Although  the  Plaintiff immediately contacted e-filing support, they referred him to a number of different individuals - a process that took days."  *Id.* ¶ 184. "The Plaintiff, however, could not post a bond until the system issued a docket number for the appeal. While waiting for e-filing support to resolve the technical

issues, his 5 day deadline passed." *Id.* ¶ 185.  The Caprios filed a motion to terminate the stay pending appeal, which the court granted because the Plaintiff could not post the appeal bond.  *Id.* ¶ 186.  The Caprios hired a state marshal and directed him to evict the Plaintiff.  *Id.* ¶  188.

**Conn. Gen. Stat. § 47a-26c**

Conn. Gen. Stat. § 47a-26c affords tenants 3 days to plead in summary process actions, but does not reduce the thirty day deadline for landlords to file objections to their tenants' pleadings.  *Id.* ¶ 193.  On December 9, 2016, the Plaintiff filed a motion to dismiss in the summary process action and the court scheduled a hearing on the motion for December 22, 2016.  *Id.* ¶¶ 196 - 97.  The Caprios did not file an objection to the Plaintiff's motion to dismiss prior to the hearing. *Id.* ¶ 198.  "At the December 22, 2016 hearing, the Caprios, through counsel, voiced an oral objection to the Plaintiff's motion to dismiss. The Plaintiff was not provided notice of their objection prior to the hearing itself." *Id.* ¶ 199.  The Plaintiff asked the court for a continuance so that he could research the objection.  *Id.* ¶ 200.  The court declined the Plaintiff's request for a continuance but allowed for a brief recess, which was insufficient to permit the Plaintiff to research the issue.  *Id.* ¶¶ 200 – 01.  The court denied the Plaintiff's motion to dismiss at the hearing "based on the Caprios' objection raised orally for the first time at the hearing itself." *Id.*  ¶ 204.  "In traditional civil actions, Connecticut Practice Book § 10-31(b) would direct the clerk to schedule a hearing on the Plaintiff's motion to dismiss at least 45 days out - which allows 30 days to file an objection and 14 days to file a reply. This timetable provides notice of any objection to the motion to dismiss." *Id.* ¶ 202.  "If the Caprios had been required to file their objection in advance of the December 22, 2016 hearing, the Plaintiff would have had an opportunity to research the issue and would have uncovered substantial authority in support of his position." *Id.* ¶ 208.

## II.     PROCEDURAL HISTORY

Gorawara initiated this action on May 17, 2019.  ECF No. 1.  The Caprios moved to dismiss the complaint in July 2019.  ECF No. 15.  On October 9, 2019, Gorawara filed a first amended complaint,[1] ECF No. 24, and on November 14, 2019, the Caprios filed a motion to dismiss as to certain counts, ECF No. 27.  Gorawara filed an opposition brief, ECF No. 30.  I granted the motion to dismiss without prejudice in light of the plaintiff's *pro se* status, and granted him leave to amend. ECF No. 32.  Gorawara thereafter filed a second amended complaint.  ECF No 34.  The Caprios then filed the instant motion to dismiss, ECF No. 39, to which Gorawara has filed a brief in opposition.  ECF No. 46.

## III.    LEGAL STANDARD

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face" and must give the defendant "fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted). Although the Court must accept the factual allegations as true and "draw all reasonable inferences in favor of the non-moving party," *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co*., 517 F.3d 104, 115 (2d Cir. 2008), it must grant the moving party's motion if "a complaint is based solely on wholly conclusory allegations and provides no factual support for such claims ...." *Scott v. Monroe*, 306 F. Supp. 2d 191, 198 (D. Conn. 2004).  "Although courts must interpret a *pro se*

---

[1] Gorawara requested, and I granted, two motions for extensions of time in which to file a response to the motion to dismiss or file an amended complaint.  ECF Nos. 19, 23.

complaint liberally, the complaint will be dismissed unless it includes sufficient factual allegations to meet the standard of facial plausibility." *Doyle v. Santiago*, No. 3:19CV901, 2019 WL 5298147, at *1 (D. Conn. Oct. 18, 2019).

## IV.   DISCUSSION

### A.   Counts 1 & 10: 42 U.S.C. §§ 1981 and 1982[2]

In counts 1 and 10, Gorawara alleges that Carolyn Caprio discriminated against him based on his race in violation of 42 U.S.C. §§ 1981 and 1982.

"[S]ection 1981 protects the rights of racial minorities from discrimination in making and enforcing contracts, while section 1982 protects the right to purchase, lease, sell, hold, and convey real and personal property." *C.C.M.S. v. Oxford Realty & Holdings LLC*, No. 20 CIV. 3429, 2021 WL 2941827, at *3 (S.D.N.Y. July 12, 2021) (internal quotation marks omitted).  "Because of the related origins and language of the two sections, they are generally construed *in pari materia*." *Choudhury v. Polytechnic Inst. of New York*, 735 F.2d 38, 43 n.5 (2d Cir. 1984).  "To establish a claim under 42 U.S.C. §§ 1981 and 1982, a plaintiff must prove the following elements: (1) the plaintiff is a member of a racial minority; (2)  the defendant acted with the requisite intent to discriminate based on race; and (3) the discrimination concerned one or more of the activities enumerated in the statute including the right to make and enforce contracts such as a real estate contract or lease agreement." *C.C.M.S.,* 2021 WL 2941827, at *3 (quotation and citations omitted). The Caprios focus on the second prong and contend that Gorawara has not sufficiently alleged facts that would indicate racial animus.  ECF No. 40 at 3.

---

[2] The Court addresses the Caprios' arguments in the order in which they were presented in the motion to dismiss.

To survive a motion to dismiss, "[a] plaintiff is required to set forth factual circumstances from which discriminatory motive can be inferred. . . . In the absence of such allegations, dismissal at the pleading stage is warranted." *Perry v. State of New York,* No. 08 Civ. 4610, 2009 WL 2575713, at *2 (S.D.N.Y. Aug. 20, 2009). "In order to show a discriminatory intent, the events of intentional and purposeful discrimination, as well as the racial animus constituting the motivating factor for [the] [defendant]'s actions, must be specifically pleaded in the complaint." *Griffin v. Santander Bank*, No. 12CV1249, 2014 WL 204229, at *5 (E.D.N.Y. Jan. 16, 2014) (internal quotation marks, alteration, and citation omitted). *See Yusuf v. Vassar Coll.*, 35 F.3d 709, 713 (2d Cir. 1994) (a plaintiff must specifically allege the "circumstances giving rise to a plausible inference of racially discriminatory intent.") "A plaintiff's 'naked allegation' of racial discrimination on the part of a defendant is too conclusory to survive a motion to dismiss." *Albert v. Carovano*, 851 F.2d 561, 572 (2d Cir. 1988).

In his opposition, Gorawara places great emphasis on his allegations that after seeing his Om ornament, the Caprios placed a crucifix near the entrance to his apartment, ECF No 46 at 33, but these allegations fail to raise an inference of *racial* discrimination. However, Gorawara also alleges that the Caprios refused to deposit his rent check - something that they have never done with their Caucasian tenants, ECF No. 34 ¶¶ 31, 39, which permitted them to initiate eviction proceedings. He also alleges although the Caprios notify their Caucasian tenants if they do not receive their rent check within a few days after it is due, they did not notify him with regard to his November 2016 rent check. *Id*. ¶ 33. Although meagre, at this stage of the proceedings, these allegations suffice to "give plausible support to a minimal inference of discriminatory motivation." *Littlejohn v. City of N.Y.*, 795 F.3d 297, 311 (2d Cir. 2015).

B.    **Count 15: 42 U.S.C. § 1985**

In count 15, the Plaintiff asserts claims against the Caprios under 42 U.S.C. §§ 1985(2) and

(3).  Defendants argue the claims should be dismissed because the Plaintiff fails to plausibly allege

discriminatory animus.  ECF No. 40 at 5.

The Plaintiff alleges that "the Caprios, together with at least one co-conspirator, engaged

in an intimidation campaign designed to deter the Plaintiff from seeking legal redress" in violation

of 42 U.S.C. § 1985(2).  ECF No. 34 ¶ 228.

To state a cause of action under the second clause of Section 1985(2)[3], a plaintiff must

allege

> (1) a conspiracy (2) for the purpose of impeding, hindering, obstructing, or
> defeating, in any manner, (3) the due course of justice in any [state court], (4) with
> intent to deny to any citizen the equal protection of the laws, or to injure him or his
> property for lawfully enforcing, or attempting to enforce, the right of any person,
> or class of persons, to the equal protection of the laws.

*Marshall v. Webster Bank, N.A.,* No. 3:10CV908, 2011 WL 219693, at *9 (D. Conn. Jan. 21,

2011).  In addition, "a claim under the second clause of Section 1985(2) requires 'a showing of

class-based invidiously discriminatory animus' on the part of the conspiring parties."  *Langton v.*

*Town of Chester Library Bd.*, No. 14CV9474, 2020 WL 2850898, at *4 (S.D.N.Y. June 1, 2020)

(citations omitted).  This claim rests on Plaintiff's allegation that the Caprios mounted a crucifix

close in time to the hearing on Plaintiff's motion in the eviction action. *See* ECF No. 34 ¶ 56

("shortly before a hearing in the eviction action, John Caprio, at the insistence of Carolyn Caprio,

mounted a big and heavy crucifix to the wall at the entrance of the Plaintiff's apartment."); ¶ 142

("the temporal proximity of the crucifix's mounting to the imminent state court hearing granted for

---

[3] The first clause of Section 1985(2) deals with intimidation of parties and witnesses in federal
court.

the Plaintiff's motion in the eviction action was alarming"); ¶ 145 ("After the crucifix was mounted,

the Plaintiff did not attend the state court hearing in support of his motion because he worried that

mounting the crucifix shortly before a court hearing was a warning that the Caprios retain the keys

to his apartment and can send an agent to hurt him if he continues to seek legal redress.")  But as

set forth above, these allegations fail to plausibly raise an inference that the Caprios were motivated

by racial animus.  Plaintiff also has not alleged facts suggesting that the Caprios conspired to

obstruct or interfere with the state court proceeding.

Plaintiff also alleges that the Caprios "engaged in an intimidation campaign designed to

pressure the Plaintiff to move out of his apartment and/or never return to the neighborhood" in

violation of § 1985(3).  ECF No. 34 ¶ 229.

> To state a claim under section 1985(3), a plaintiff must allege
>
> (1) a conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States. . . . Furthermore, the conspiracy must also be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.

*Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999) (internal citations and quotation marks

omitted).  A plaintiff must provide "some factual basis supporting a meeting of the minds, such

that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v.

Goord*, 340 F.3d 105, 110–11 (2d Cir. 2003) (quoting *Romer v. Morgenthau*, 119 F. Supp. 2d 346,

363 (S.D.N.Y. 2000)).  In addition, a plaintiff "must allege, with at least some degree of

particularity, overt acts which defendants engaged in which were reasonably related to the

promotion of the claimed conspiracy." *Roach*, 165 F.3d at 147.  Liberally construing the complaint

and drawing all reasonable inferences in the Plaintiff's favor, the Court finds that the complaint

alleges that based on the Plaintiff's race, the Caprios entered into a scheme to evict him by refusing to deposit his rent check, ECF No. 34 ¶¶ 33-34, engaged in a "campaign to harass and intimidate the Plaintiff to leave," *id.* ¶ 41, "threatened and bullied the Plaintiff" and threatened "the safety of [his] belongings." *Id.* ¶ 23. The complaint also alleges that the Caprios did not treat their Caucasian tenants in the same manner. *Id.* ¶¶ 33, 39, 46. At this stage, these allegations suffice to state a claim under § 1985(3).

### C.    Counts 11 – 13; Constitutional Challenges to Landlord-Tenant Statutes under 42 U.S.C. § 1983

In counts 11, 12, and 13, the Plaintiff alleges that the Caprios violated his constitutional rights by the operation in the summary process action of certain Connecticut state statutes – §§ 52-215, 47-35a(a), and 47a-26c - that he asserts are unconstitutional. The Caprios argue that the Plaintiff's § 1983 claims against them fail because they are not state actors. ECF No. 40 at 5. Before reaching the issue of state action, the Court "must determine that it has subject matter jurisdiction over the matter." *Humphrey v. Syracuse Police Dep't*, 758 Fed. App'x 205, 206 (2d Cir. 2019).

### 1.    Standing

"For a case to proceed, the party invoking federal jurisdiction must plausibly plead that it has standing to sue.… Subject matter jurisdiction is a threshold question that must be resolved ... before proceeding to the merits." *Id.* (internal quotation marks and citations omitted). *See Manway Const. Co. v. Hous. Auth. of City of Hartford*, 711 F.2d 501, 503 (2d Cir. 1983) ("It is common ground that in our federal system of limited jurisdiction any party or the court *sua sponte*, at any stage of the proceedings, may raise the question of whether the court has subject matter jurisdiction; and, if it does not, dismissal is mandatory.")

[T]he irreducible constitutional minimum of standing contains three

elements. First, the plaintiff must have suffered an injury in fact - an invasion of a legally protected interest which is (a) concrete and particularized ... and (b) actual or imminent, not conjectural or hypothetical .... Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.... Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks omitted).

"[A] plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

The Plaintiff lacks standing to assert the claims in Counts 11 and 13.  In count 11, the Plaintiff alleges that the Caprios deprived him of his Seventh Amendment right to a jury trial because Conn. Gen. Stat. § 52-215 does not provide for jury trials in summary process actions. But Plaintiff's injury - the entry of a default judgment and his subsequent eviction - did not result from the unavailability of a jury trial.  It resulted instead from Plaintiff's refusal to file an answer to the summary process complaint.  ECF No. 34 ¶¶ 166-67.  As a result of Plaintiff's failure to file an answer, default judgment entered, which "conclusively establish[ed] the facts alleged in the [Caprios'] complaint." *Dziedzicv. Pine Island Marina, LLC*, 143 Conn. App. 644, 645 (2013).  The Plaintiff's alleged injury is not fairly traceable to the statute, but rather to his decision not to file an answer.[4]  As a result, he lacks standing to pursue this claim.

Count 13 suffers from a similar standing problem.  There,  Plaintiff alleges that the Caprios

---

[4] The Plaintiff alleges that he refused to file an answer to the complaint so as not to "waive" his jury claim, but that claim is inconsistent with his allegations and the applicable law.  According to the complaint, under the circumstances of his case, the deadline under § 52-215 in which to file a jury claim was ten days *after* he filed his answer.  ECF No. 34 ¶¶ 164-65; *see also* Conn. Gen. Stat. § 52-215 (requiring entry of case on docket as jury case if requested by a party "within ten days after [an] issue of fact is joined").  Filing the answer, therefore, would not have "waived" his jury claim.

deprived him of due process and equal protection "as well as his federal statutory rights under 42 U.S.C. § 3615" because Conn. Gen. Stat. § 47a-26c affords tenants 3 days to plead "and does not reduce the thirty day deadline for landlords to file objections to their tenants' pleadings." ECF No. 34 ¶¶ 193, 218-19.  Because of this "timing mismatch," Plaintiff was not aware of the Caprios' objection to his motion until it was raised at the hearing.  *Id.* ¶¶ 203-05.  Had the summary process action been treated as a "traditional civil action," Plaintiff alleges, a hearing would have been scheduled on his motion to dismiss "at least 45 days out - which allows 30 days to file an objection and 14 days to file a reply."  *Id.* ¶ 202.  This would have given Plaintiff notice of the objection and additional time in which to research the issue the Caprios raised.  *Id*. ¶ 208.  With such additional time, Plaintiff alleges, he "would have uncovered substantial authority" in support of a legal argument opposing the Caprios' objection.  *Id*.  But this speculative chain of reasoning fails to plausibly allege causation.  Plaintiff's allegations do not suggest that the operation of the statute caused his injury – that is, that the state court judge denied his motion because of the different pleading deadlines.  Most of the authority Plaintiff cites in his complaint on the issue the state court judge decided in denying Plaintiff's motion does not address the specific legal point made by the Caprios in opposing that motion, *Id.* ¶¶ 211-215, and the lone authority that does would not have been binding on the housing court judge and is, in any event, contradicted by more recent persuasive authority in the Connecticut Superior Court.  *Compare Zlokower v. Pelletier*, No. SPH-8110-12388, 1981 WL 164257, at *3 (Conn. Super. Ct. Jan. 6, 1981) (case cited by Plaintiff finding language of retaliatory eviction statute, Conn. Gen. Stat. § 47a-20, jurisdictional) *with Renaissance Mgmt. Co. v. Barnes*, No. NHSP-117313, 2015 WL 2406899, at *1 n.2 (Conn. Super. Ct. May 7, 2015) (reaching opposite conclusion and citing cases).  In other words, the allegations that but for the operation of the pleading deadlines, the Plaintiff would have won his motion and staved off

eviction is speculative and does not provide a basis for standing.

### 2. *Rooker-Feldman*

Plaintiff's claim in Count 12 is barred by the *Rooker-Feldman* doctrine, which prohibits federal district court from exercising jurisdiction "over suits that are, in substance, appeals from state-court judgments." *Maddox v. Prudenti*, 303 Fed. App'x 962, 964 (2d Cir. 2008). "*Rooker– Feldman* directs federal courts to abstain from considering claims when four requirements are met: (1) the plaintiff lost in state court, (2) the plaintiff complains of injuries caused by the state court judgment, (3) the plaintiff invites district court review of that judgment, and (4) the state court judgment was entered before the plaintiff's federal suit commenced." *McKithen v. Brown*, 626 F.3d 143, 154 (2d Cir. 2010).

In Count 12, Plaintiff alleges that the Caprios deprived him of equal protection based on the operation of Conn. Gen. Stat. § 47a-35a(a), which requires that residential tenants (but not commercial tenants) post a bond within "the period allowed for taking such appeal"- that is, 5 days from when judgment is entered.  ECF No. 34 ¶¶ 175-76.  Plaintiff alleges that he filed an appeal in the summary process action but that due to a computer glitch, was unable to post a bond within the 5 day period.  *Id.* ¶¶ 183 – 86; *see also* Conn. Gen. Stat. § 47a-35(b) (conditioning stay of execution on posting of bond by residential tenant).  "The Caprios filed a motion to terminate the stay pending appeal.  The court was required to grant this request pursuant to § 47a-35a(a) because the Plaintiff did not - because he could not - post the appeal bond until the e-filing malfunction was resolved." *Id.* ¶ 186.  "The termination of a stay pending appeal in a summary process action ends the appeal if the landlord chooses to perform the eviction." *Id.* ¶ 189.  Plaintiff alleges that if he had been a commercial tenant, "the Caprios would not have been able to terminate his stay pending appeal - and therefore, his opportunity to appeal - based  on compliance with the strict 5

day deadline." *Id.* ¶ 189.

The requirements of the *Rooker-Feldman* doctrine are satisfied.  First, the Plaintiff lost in the state court eviction action.  Second, the Plaintiff is complaining about an injury - his eviction - that was caused by the state court judgment awarding possession to the Caprios and the state court's refusal to stay that judgment due to his failure to comply with what he contends is an unconstitutional bond requirement.  Third, he is inviting this Court to review that judgment by challenging the constitutionality of the provision by which the state court refused to stay the judgment.  Fourth, the Plaintiff filed this action after the adverse state court judgment was entered.  As a result, the court lacks jurisdiction.  *See Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 87 (2d Cir. 2005) (stating that *Rooker–Feldman* precludes consideration by a federal district court of claim "complaining of an injury caused by the state judgment"); *Gyadu v. Bainer*, No. 3:19CV1120, 2021 WL 2073919, at *5 (D. Conn. May 24, 2021) (*Rooker-Feldman* barred plaintiff's claim because the constitutional injuries he complained of were caused by the state court judgment in eviction action).

### 3.    State Action

Even if the Court had subject matter jurisdiction, the Plaintiff's claims in count 11 – 13 would fail under Fed. R. Civ. P. 12(b)(6) because he has not plausibly alleged that the Caprios are state actors.

Section 1983 provides that "[e]very person who, under color of any [state] statute, ordinance, regulation, custom, or usage ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.

21

"Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes state action." *Flagg v. Yonkers Sav. & Loan Ass'n*, 396 F.3d 178, 186 (2d Cir. 2005) (internal quotation marks omitted). "A plaintiff pressing a claim of violation of his constitutional rights under § 1983 is thus required to show state action." *Tancredi v. Metro. Life Ins. Co.*, 316 F.3d 308, 312 (2d Cir. 2003); *see also Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 n.2 (2001) ("If a defendant's conduct satisfies the state-action requirement of the Fourteenth Amendment, the conduct also constitutes action 'under color of state law' for § 1983 purposes.").

> For the purposes of section 1983,
>
> the actions of a nominally private entity are attributable to the state when: (1) the entity acts pursuant to the "coercive power" of the state or is "controlled" by the state ("the compulsion test"); (2) when the state provides "significant encouragement" to the entity, the entity is a "willful participant in joint activity with the [s]tate," or the entity's functions are "entwined" with state policies ("the joint action test" or "close nexus test"); or (3) when the entity "has been delegated a public function by the [s]tate," ("the public function test").

*Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (quoting *Brentwood Acad.*, 531 U.S. at 296).

Plaintiff posits that the Caprios should be regarded as state actors based on *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982) because they "enlisted the compulsive powers of the State to seize possession" of the apartment by virtue of the operation of the challenged statutes. ECF No. 34 at ¶ 155.

In *Lugar*, the Supreme Court held that a creditor who secured an ex parte prejudgment attachment of a debtor's property pursuant to state statute acted "under color of state law" for purposes of § 1983. 457 U.S. at 924–25. In so concluding, the Court noted the "constitutional due

process requirements" in the context of prejudgment attachments, *id.* at 927, and observed that the statute at issue authorized a court clerk to issue a writ of attachment based solely on a creditor's ex parte petition. *Id.* at 924. No judge reviewed the petition before the clerk issued the writ. *Id.* The Court concluded that a private party's "invoking the aid of state officials to take advantage of state-created [prejudgment] attachment procedures" to attach property on an ex parte application constituted joint action. *Id.* at 942 ("Whatever may be true in other contexts, this is sufficient when the State has created a system whereby state officials will attach property on the ex parte application of one party to a private dispute.") The Court made clear that its holding "is limited to the particular context of prejudgment attachment." *Id.* at 939 n.21. It further clarified that it was not holding that a private party's "mere invocation of state legal procedures constitutes joint participation or conspiracy with state officials satisfying the § 1983 requirement of action under color of law." *Id.* (quotations and citations omitted).[5]

Here, the statutes that governed the administration of the Caprios' litigation in state court – specifying pleading deadlines, appeal requirements, and availability of a jury trial – are not analogous to the ex parte attachment statute at issue in *Lugar*. None of them involve joint action with state officials.[6] And unlike the plaintiff in *Lugar*, Plaintiff participated in the litigation of the

---

[5] The Court cautioned that without "careful adherence" to the limits imposed by the state action doctrine, "private parties could face constitutional litigation whenever they seek to rely on some state rule governing their interactions with the community surrounding them." *Lugar,* 457 U.S. at at 937.

[6] Treating the involvement of a state marshal in the eviction as an indication that the procedures governing the eviction litigation made the Caprios state actors would prove too much. It would make a state actor out of any private litigant who invoked a statute or rule that violated the Constitution in the course of obtaining a money judgment, on the ground that enforcement of the judgment necessitated the involvement of a marshal to levy on property. Such a sweeping rule would transform "mere invocation of state legal procedures [into] joint participation or conspiracy with state officials satisfying the § 1983 requirement of action under color of law," *Lugar,* 457 U.S. at 939 n.21, precisely what the Supreme Court sought to avoid in *Lugar*. Also, it is unclear that state marshals, who are not employees of the State, are state actors. *See, e.g., Wright v.*

summary process action and was afforded the opportunity to contest the Caprios' claim.  The facts alleged in the second amended complaint fail to plausibly suggest that the operation of the statutes in the state court eviction case transformed the Caprios into state actors for purposes of § 1983. *See Hill v. Langer,* 86 Fed. App'x 163 (6th Cir. 2004) (in constitutional due process challenge to Michigan eviction law provision, rejecting plaintiff's claim that landlords' ex parte application for a writ of execution rendered them state actors under *Lugar* on the grounds that the application followed a hearing and that *Lugar* was "limited to the particular context of prejudgment attachment").

**D.      Count 14: Conspiracy with Police Officer and State Marshal under 42 U.S.C. § 1983**

In count 14, Gorawara alleges that the Caprios "acted in a concerted manner" with (1) "a police officer on May 17, 2017 to violate the Plaintiff's equal protection rights, First Amendment rights, and federal statutory rights guaranteed by 42 U.S.C. § 3615" and (2) "the state marshal they hired to deny the Plaintiff notice of the date and time they will evict him, thereby violating the Plaintiff's equal protection rights."  ECF No. 34 ¶¶ 224-25.

To establish a constitutional violation under § 1983, a plaintiff must show that: "(1) the defendants acted under color of state law; and (2) the defendants' actions resulted in a deprivation of plaintiff's constitutional rights."  *Bhatia v. Yale Sch. of Med.*, 347 Fed. App'x 663, 664 (2d Cir. 2009).  "Private parties are generally not amenable to suit under § 1983, because they are not state actors, although they may be liable ... where they are 'jointly engaged with state officials' in a conspiracy to deprive the plaintiff of his constitutional rights...."  *Id.* at 664-65 (quoting *Adickes v.*

---

*Dzurenda*, No. NNHCV175038715, 2018 WL 4575861, at *2 (Conn. Super. Ct. Sept. 5, 2018) (dismissing constitutional claim against state marshal where plaintiff failed to show marshal was state actor).

*S.H. Kress & Co.*, 398 U.S. 144, 152 (1970)). "[A] plaintiff must allege that the private entity and state actors carried out a deliberate, previously agreed upon plan, or that their activity constituted a conspiracy or meeting of the minds." *Johnson v. City of New York*, 669 F. Supp. 2d 444, 450–51 (S.D.N.Y. 2009) (internal quotations marks and citation omitted).  A conspiracy claim under § 1983 requires the plaintiff to show "(1) an agreement between two or more state actors or between a state actor and a private entity, (2) to act in concert to inflict an unconstitutional injury, and (3) an overt act done in furtherance of that goal, causing damages."  *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999).

As to the police officer, Plaintiff alleges that during the eviction process (which Plaintiff alleges was race-based), the Caprios spoke to the police officer "at length" and "reached an agreement . . . to ensure that the Plaintiff never returns to the neighborhood."  ECF No. 34 at ¶¶ 84, 86.  The police officer "agreed to intimidate the Plaintiff to never return to Mansfield Street again and in exchange the Caprios agreed to stop calling the officer." *Id* at ¶ 86.  The officer then "left" the scene to "go find the Plaintiff," and upon locating him, "demanded" he never come back to the area. *Id.* at ¶¶ 87 - 89.  Liberally construing the complaint, the Court finds that Gorawara's allegations as to the police officer, although thin, plausibly allege a § 1983 conspiracy claim.

Gorawara's allegations as to the state marshal, however, fall short (to the extent state marshals can even be considered state actors). *See Wright v. Dzurenda*, 2018 WL 4575861, at *2. Gorawara alleges only that "[n]either the Caprios nor the state marshal they hired gave the Plaintiff notice that the eviction would occur on May 17, 2017" and that "the state marshal gave the Plaintiff the wrong date – and did not correct it despite having the Plaintiff's phone number."  ECF No. 34 ¶ 70.  Plaintiff fails to allege facts plausibly suggesting an agreement between the Caprios and the

state marshal to act in concert to inflict a constitutional injury on Plaintiff.[7]  "A merely conclusory allegation that a private entity acted in concert with a state actor does not suffice to state a § 1983 claim against the private entity."  *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002) (internal quotation marks and citation omitted).

### E.        Count 8: Conn. Gen. Stat. § 52-571c

In count 8, Gorawara asserts a claim against Carolyn Caprio under Connecticut's hate crime statute, § 52-571c[8], alleging that she "and her agents acted with specific intent to intimidate and harass the Plaintiff based on their perceptions of his race, religion, and ethnicity."  ECF No. 34 at ¶ 135.

Section § 52–571c provides for a civil cause of action based on a violation of, among other statutes, § 53a–181l, a criminal statute that prohibits intimidation based on bigotry or bias.  Conn. Gen. Stat. § 53a-181l provides:

> (a) A person is guilty of intimidation based on bigotry or bias in the third degree when such person, with specific intent to intimidate or harass another person or group of persons because of the actual or perceived race, religion, ethnicity, disability, sex, sexual orientation or gender identity or expression of such other person or persons: (1) Damages, destroys or defaces any real or personal property, or (2) threatens, by word or act, to do an act described in subdivision (1) of this subsection or advocates or urges another person to do an act described in subdivision (1) of this subsection, if there is reasonable cause to believe that an act described in said subdivision will occur.
> Read liberally, the complaint alleges that based on Plaintiff's race, John Caprio, Carolyn's

agent, threatened Plaintiff's property, ECF No. 34 ¶ 34, entered Plaintiff's apartment and took his

---

[7] Also, although Gorawara alleges violation of his constitutional right to "Equal Protection," it is not clear how the alleged conduct concerning the state marshal constituted a constitutional violation.

[8] Conn. Gen. Stat. § 52-571c provides:
> Any person injured in person or property as a result of an act that constitutes a violation of section 53a-181j, 53a-181k or 53a-181l may bring a civil action against the person who committed such act to recover damages for such injury.

things, *id.* ¶ 25, encouraged others to take Plaintiff's property, *id.* ¶ 24, and threatened the "safety of the Plaintiff's belongings," *id. ¶ 23*.  Plaintiff has sufficiently alleged that because of his race, Carolyn Caprio threatened to damage his personal property under § 53a-181l.

## V.     CONCLUSION

For these reasons, the motion to dismiss is GRANTED as to  counts 11 - 13, the § 1985(2) claim in count 15,  and the § 1983 conspiracy claim as to the state marshal in count 14 and DENIED as to counts 1 and 10, the § 1985(3) claim in count 15, and § 1983 conspiracy claim as to the police officer in count 14.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.


Dated:          Hartford, Connecticut
                September 28, 2021